JUDGE DANIELS

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

The JAY PETER KAUFMAN REVOCABLE
TRUST, On behalf of Itself and All Others
Similarly Situated,

                  Plaintiff,

    vs.

NEW CENTURY FINANCIAL CORPORATION,
BRAD A. MORRICE, ROBERT K. COLE,
MARYLIN A. ALEXANDER, HAROLD A.
BLACK, FREDRIC J. FORSTER, EDWARD F.
GOTSCHALL, DONALD E. LANGE, MICHAEL
M. SACHS, RICHARD A. ZONA, PATTI M.
DODGE, WILLIAM J. POPEJOY, BEAR
STEARNS & CO., INC., STIFEL NICOLAUS &
COMPANY, INCORPORATED, DEUTSCHE
BANC SECURITIES, INC., JMP SECURITIES
LLC, PIPER JAFFRAY & COMPANY, and ROTH
CAPITAL PARTNERS LLC,

                Defendants.

Civ. No. **07 CV 2903**



**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

RECEIVED
APR 10 2007
U.S.D.C. S.D.N.Y.
CASHIERS



## BASIS OF THE ALLEGATIONS

Plaintiff the Jay Peter Kaufman Revocable Trust ("Plaintiff"), alleges the following based upon the investigation by their counsel (except for paragraphs 1 and 14, which are alleged based upon the personal knowledge of the Plaintiff) which included, *inter alia*, a review of the following information: the Defendants' public documents; information concerning the Company and announcements made by the Defendants and/or their employees or other representatives; filings with the United States Securities and Exchange Commission ("SEC") and the United States Bankruptcy Court for the District of Delaware; press releases published by and concerning New Century Financial Corporation ("New Century" or the "Company") and its business, financial and operational results; securities and credit analysts' reports and advisories about the Company; newspaper articles and reports from the media; and direct interviews with former employees familiar with many of the facts and circumstances surrounding the allegations set forth below. Plaintiff believes that upon further discovery, substantial additional evidentiary support will be uncovered which will support the allegations set forth herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This class action seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") and is brought by Plaintiff, purchaser of shares of New Century's 9.125% Series A Cumulative Redeemable Preferred Stock ("Series A Preferred"), on behalf itself and of all those who purchased or otherwise acquired New Century Series A Preferred stock between June 15, 2005 and February 7, 2007, inclusive (the "Class Period") pursuant and/or traceable to New Century's offering of said Series A Preferred stock (the "Offering").

2.     The Company's Offering Documents (defined below at page 12, footnote 2) in connection with the Series A Preferred Offering were materially false and misleading. At the time of the Effective Date of the Offering, the Defendants concealed from and failed to disclose material adverse facts concerning, *inter alia*, the Company's financial and business condition and well-being. Specifically, Defendants failed to disclose at least the following material adverse

-1-

facts and conditions that threatened the Company's survival and the value of its shareholders' investments:

(a)    that the Company's reserves for loan losses were grossly insufficient;

(b)    that New Century failed to timely write down for residual interests in securitizations;

(c)    that the Company did not properly account for early-payment default and loan repurchase loss allowances;

(d)    that New Century was operating in an extremely risky and volatile industry without adequate internal and financial or business controls or monitors, and specifically lacked, among other things, any adequate policies, practices, procedures or safeguards for, *inter alia*, properly evaluating the creditworthiness of borrowers or evaluating or managing the increased risks associated with the segments of the mortgage industry in which New Century operated;

(e)    that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principals ("GAAP"); and

(f)    that, as a result of the these and other material omissions and misrepresentations, the Offering Documents were materially false and misleading.

2.    Unbeknownst to the Plaintiff and other Class members, prior to, and during the Offering, the internal business and financial environment and structure at New Century was in a severe state of deterioration. For example, as set forth in greater detail below, and as indicated by former Company employees and insiders, New Century's internal business and lending practices were riddled with the following serious problems:

(a)    The Company employed extremely lax lending guidelines which were not strengthened until late 2006 and early 2007. The eventual strengthening of these guidelines just before the Company announced its restatement in February 2007 finally, and belatedly, resulted in a "tremendous" decline in loans and loan applications at New Century because these applications no longer qualified under the newly tightened guidelines. While the Company

falsely had claimed in its May 6, 2005 Prospectus and in the June 15, 2005 Prospectus Supplement to have "developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially higher credit risks associated with this segment of the mortgage industry," accordingly to former employees this "sophisticated" and "comprehensive" process was in fact based merely based upon routine factors such as potential borrowers' credit scores, which were used industry-wide and were in any event routinely disregarded at New century for the sake of approving otherwise unqualified loans.

(b) The Company was obsessed with the volume of loan production, at the expense of the quality of loans made, and a improper and extreme favoritism shown to high-volume mortgage and loan brokers. One former New Century loan officer stated that it was routine at New Century to stretch and/or make exceptions to the Company's lending guidelines to qualify borrowers for loans who would otherwise have only qualified for smaller loans, or would not have qualified for any loan at all. While New Century's May 6, 2005 Prospectus and June 15, 2005 Prospectus Supplement claimed that it purportedly "originate[d] and purchase[d] loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV," these criteria were at best only preliminary, and were routinely ignored or altered to push through risky loans. As indicated by these former employees, sales and volume considerations, and meeting or exceeding loan quotas, ruled the day at New Century.

(c) New Century's payment to loan officers at New Century was based overwhelmingly upon incentive commissions, and through an incentive structure which further encouraged loan officers to write more, larger and riskier loans by awarding commissions amounting to higher and higher percentages of the fees charged for each new loan written.

(d)    Loans that were not yet "funded" or "closed" were improperly counted towards month-end tallies of completed loans, a practice equivalent to "pulling revenue forward," which created a skewed financial picture of the Company for any given month.

3.    New Century only revealed the truth about its deteriorated and out-of-control financial and business condition on February 7, 2007, after the Offering. On that day, after the market had closed, the Company announced that it would be forced to restate its financial results for the full year 2006. In this connection, New Century confessed that it had materially misstated its financial statements for the entire year 2006 and that those financial statements were essentially worthless and could not be relied upon. The Company's admissions, especially when coupled with the facts herein adduced from the investigation of Plaintiff's counsel, further evidences that the Company's statements made in connection with the Series A Preferred Offering in 2005 were materially false and misleading, and that, among other things, the Company's business and lending practices were seriously flawed going back to the beginning of 2005, and possibly even earlier.

4.    On the news of this impending restatement, the share price of the Company's Series A Preferred stock fell from $24.28 per share on February 7, 2007 to close at $18.42 per share several days later on February 12, 2007.

5.    The fallout from the disclosure of the truth about the Company's financial condition and business practices continued to damage the Company and its assets and value. Since the February 7 disclosure, New Century's stock has been suspended from trading on and de-listed from the NYSE. The Company also delayed indefinitely the announcement of its fourth quarter and full year 2006 financial results, announced that its lenders have completely terminated its access to any financing and accelerated New Century's loan repurchase obligations under its respective agreements with them.

6.    The Company's improper business and lending practices, previously unknown to investors, have also come under widespread regulatory scrutiny. On March 14, 2007, according to a *Reuters* article, the Ohio Attorney General reportedly obtained a court order effectively

prohibiting New Century from doing business in that state, and accusing the Company of engaging in "predatory" lending practices and violating Ohio's Consumer Sales Practices Act, Mortgage Loan Act, and Mortgage Brokers Act. Cease-and-desist orders have also reportedly been issued by regulators in New York, New Jersey, Massachusetts, and New Hampshire preventing New Century from taking new loans in those states.

7.     Both the SEC and the U.S. Department of Justice have launched investigations into accounting irregularities at New Century. After the market close on Friday, March 2, 2007, New Century disclosed for the first time that the U.S. Attorney's Office for the Central District of California had notified the Company that it is conducting a criminal inquiry in connection with trading in New Century's stock and that the U.S. Attorney is also investigating accounting issues regarding New Century's allowance for loan repurchase losses.

8.     On March 27, 2007 SEC Chairman Christopher Cox informed Congress that that agency was also examining New Century and other lenders had failed to make proper disclosures to investors who had purchased securitized sub-prime mortgages.

9.     Finally, after weeks of speculation that it would ultimately do so, the Company that had promoted itself as "A New Shade of Blue Chip" filed for Chapter 11 bankruptcy on April 2, 2007 in the United States District Court for the District of Delaware.

### JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

11.     This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §§1331 and 1337.

12.     Venue is proper in this District pursuant to Section 22 of the Securities Act, as many of the acts charged herein occurred in substantial part in this District. Venue is also proper in this judicial district pursuant to 28 U.S.C. §1391 because several of the defendants, including

the Underwriter Defendants, are headquartered and/or do substantial business within this District.

13.    In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, *inter alia*, the mails and telephonic communications and the facilities of the NYSE, a national securities exchange.

## THE PARTIES

### The Plaintiff

14.    Plaintiff the Jay Peter Kaufman Revocable Trust purchased New Century Series A Preferred Stock, as set forth in the certification attached hereto and incorporated herein by reference, pursuant and/or traceable to the Company's public Offering, and were damaged thereby. Plaintiff brings this action on behalf a Class of those who purchased or otherwise acquired New Century Series A Preferred stock pursuant and/or traceable to the Offering during the Class Period.

### Defendant New Century

15.    Defendant New Century is a corporation incorporated under the laws of Maryland and has principal business offices at 18400 Von Karman Avenue, Suite 1000, Irvine, CA. New Century is a REIT, and is focused on the business of "sub-prime lending."[1] Specifically, New Century makes mortgage loans to persons who are generally unable to access credit from traditional financial institutions because they do not satisfy credit, documentation or other underwriting standards mandated by these traditional mortgage lenders and loan buyers, which typically lend only to more creditworthy borrowers. The Company originates and purchases mortgage loans through two divisions: the Wholesale Division and the Retail Division. On

---

[1] REIT's are publicly traded companies that typically make investments in and/or manage real estate and pay rental income and profits to shareholders, and/or (in the case of "Mortgage REITs") invest in mortgage loans secured by real estate. These secured mortgage loans are typically either originated or underwritten by the REIT, or purchased by the REIT from a secondary market. The funds invested by REITs typically come from equity capital invested by shareholders or consists of debt borrowed from other lenders.

April 2, 2007, New Century filed a petition under Chapter 11 of the United States Bankruptcy Code. The now-bankrupt New Century continues to tout itself as "A New Shade of Blue Chip," a description the Company has apparently even had trademarked. New Century is afforded certain protections under the United States Bankruptcy Code and is named as a defendant herein to preserve any and all claims that Plaintiff and the other Class members may have against the Company.

**The Individual Defendants**

16.    Defendant Morrice served as a director of the Company at relevant times hereto, has been a director since 1995, and has been the Vice Chairman of the Board of Directors since December 1996. Defendant Morrice was also, at all relevant times, the Company's President and CEO, a position he assumed on July 1, 2006. Defendant Morrice has been with the Company for many years and has held a variety of senior executive management positions with New Century during that time. From January 2001 to July 2006 he was the Company's Chief Operating Officer ("COO"). Mr. Morrice also served as the Company's General Counsel from December 1995 to December 1997 and its Secretary from December 1995 to May 1999. Defendant Morrice signed the April 26, 2005 Registration Statement and the June 16, 2005 Registration Statement.

17.    Defendant Robert K. Cole ("Cole") was New Century's Chairman of the Board at relevant times hereto, from December 1995 through December 2006, and also held the position of CEO from December 1995 to July 1, 2006, when Defendant Morrice took over as CEO. Defendant Cole signed the April 26, 2005 Registration Statement.

18.    Defendant Edward F. Gotschall ("Gotschall") is a co-founder of the Company and has served as a director of the Company at relevant times hereto, since November 1995, and has been a Vice Chairman of the Board since December 1996. Defendant Gotschall has also held a variety of senior executive management positions with the Company. In July 2004 he was appointed Vice Chairman-Finance of the Company after serving as its CFO since August 1998,

and its COO-Finance/Administration from December 1995 to August 1998. Defendant Gotschall signed the April 26, 2005 Registration Statement.

19.   Defendant Marilyn A. Alexander ("Alexander") served as a director of the Company at relevant times hereto, and has been a director since May 2005. Defendant Alexander is the Chairwoman of the Board's Finance Committee, and also serves on the Board's Governance, Governance & Nominating, and Public & Community Affairs Committees. Defendant Alexander is a Certified Public Accountant ("CPA").

20.   Defendant Harold A. Black, Ph.D. ("Black") served as a director of the Company at relevant times hereto, since June 2004. Defendant Black is the Chairman of the Board's Public & Community Affairs Committee, and also serves on the Board's Governance & Nominating, and Compensation Committees. Defendant Black signed the April 26, 2005 Registration Statement.

21.   Defendant Fredric J. Forster ("Forster") became the Chairman of the Board of Directors in January 2007, has served as a director of the Company at relevant times hereto, since July, 1997. Defendant Forster is a member of the Board's Governance & Nominating, and Compensation Committees. Defendant Forster has also been designated by the Company as the "Lead Director." Defendant Forster signed the April 26, 2005 Registration Statement.

22.   Defendant Donald E. Lange ("Lange") served as a director of the Company at relevant times hereto, since November of 2002. Defendant Lange is the Chairman of the Board's Compensation Committee, and also serves on the Board's Audit and Governance & Nominating Committees. Defendant Lange signed the April 26, 2005 Registration Statement.

23.   Defendant Patti M. Dodge ("Dodge") is currently the Executive Vice President, Investor Relations, but was at relevant times hereto New Century's CFO, having held that position from July 2004 to November 2006. Defendant Dodge signed the April 26, 2005 Registration Statement.

24.   Defendant Michael M. Sachs ("Sachs") served as a director of the Company at relevant times hereto, and since November 1995. Defendant Sachs is the Chairman of the

Board's Audit Committee, and also serves on the Board's Compensation and Finance Committees. Defendant Sachs is a CPA and an attorney. Defendant Sachs signed the April 26, 2005 Registration Statement.

25.    Defendant Richard A. Zona ("Zona") served as a director of the Company at relevant times hereto, since June 2000. Defendant Zona serves on the Board's Audit and Finance Committees. Defendant Zona is a CPA, has been Chairman and CEO of Zona Financial, a private financial advisory firm, since 2000, and was formerly a partner with Ernst & Young LLP. Defendant Zona signed the April 26, 2005 Registration Statement.

26.    Defendant William J. Popejoy ("Popejoy") served as a director of the Company at times relevant times hereto, and was a director from November, 2002 until his retirement in June, 2006. Defendant Popejoy signed the April 26, 2005 Registration Statement.

27.    Defendants Morrice, Cole, Alexander, Black, Forster, Gotschall, Lange, Sachs, Zona, Dodge, and Popejoy, as identified in ¶¶ 16-26 above, are collectively referred to hereinafter as the "Individual Defendants." Each director is statutorily liable for the materially misleading misstatements and material omissions in the Offering Documents. In addition, because of their management and/or directorial positions with the Company and their ability to make public statements on behalf of New Century, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) the Company to engage in the conduct complained of herein.

**The Underwriter Defendants**

28.    Defendant Bear, Stearns & Co., Inc. ("Bear Stearns") is a leading global investment banking, securities trading and brokerage firm headquartered at 383 Madison Avenue, New York, New York 10179. Bear Stearns advertises on its website that it "help[s] corporations, institutions, governments and individuals reach their financial objectives." Defendant Bear Stearns is a subsidiary of Bear Stearns Companies, Inc., the seventh largest securities firm in the world ranked by total capital, and publicly traded company with reportedly over $70 billion in total capital and total assets of approximately $335 billion. At the time of the

Offering, New Century had an $800 million line of credit, with an outstanding balance of $567.2 million, with Bear Stearns Mortgage Capital Corporation, and affiliate of Bear, Stearns. Pursuant to the June 15, 2005 Prospectus Supplement, Bear, Stearns underwrote 2,184,000 shares of New Century Series A Preferred stock in connection with the Offering.

29.     Defendant Stifel Nicolaus & Company, Incorporated ("Stifel Nicholas") is a subsidiary of the Stifel Financial Corporation, and advertises itself as a "full service brokerage and investment banking firm" headquartered at One Financial Plaza, 501 North Broadway, St. Louis, Missouri 63102, with 121 offices in 27 states and the District of Columbia as well as three European offices. Stifel Nicolaus is reportedly listed on the NYSE under the symbol "SF". Pursuant to the June 15, 2005 Prospectus Supplement, Stifel Nicolaus underwrote 588,000 shares of New Century Series A Preferred stock in connection with the Offering.

30.     Defendant Deutsche Banc Securities, Inc. ("Deutsche Banc") was an Underwriter under the offering and pursuant to the June 15, 2005 Prospectus Supplement, underwrote 588,000 shares of New Century Series A Preferred stock in connection with the Offering.

31.     Defendant Piper Jaffray & Company ("Piper Jaffray") was an Underwriter under the offering and pursuant to the June 15, 2005 Prospectus Supplement, underwrote 588,000 shares of New Century Series A Preferred stock in connection with the Offering.

32.     Defendant JMP Securities LLC ("JMP Securities") was an Underwriter under the offering and pursuant to the June 15, 2005 Prospectus Supplement, underwrote 126,000 shares of New Century Series A Preferred stock in connection with the Offering.

33.     Defendant Roth Capital Partners, LLC ("Roth Capital") was an Underwriter under the offering and pursuant to the June 15, 2005 Prospectus Supplement, underwrote 126,000 shares of New Century Series A Preferred stock in connection with the Offering.

34.     The Underwriter Defendants are liable for the materially false and misleading statements contained in the Offering Documents.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure ["FRCP"] 23(a) and 23(b)(3) on behalf of itself all those who purchased or otherwise acquired New Century Series A Preferred stock during the Class Period, which stock was purchased and/or acquired pursuant and/or traceable to the Offering.  Excluded from the Class are Defendants herein, members of the Individual Defendants' immediate families, and any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

(a)    The members of the Class are so numerous that joinder of all members is impracticable.  New Century issued approximately 4.5 million shares of Series A Preferred stock to members of the investing public in the Offering, and as of November, 2006 there were approximately that many shares outstanding.  Subsequent to the Offering, and throughout the Class Period, the Company's Series A Preferred Stock was listed and actively traded on the NYSE under the symbol "NEWPrA."  The precise number of Class members is unknown to Plaintiff at this time but is believed to number in the thousands, at a minimum.  In addition, the names and addresses of the Class members can be ascertained from the books and records of New Century and/or its transfer agent.  Moreover, notice can be provided to such record owners by a combination of published notice and first-class mail using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

36.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel highly experienced in class action litigation under the federal securities laws to further ensure such protection, and intends to prosecute this action vigorously.

37.    Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same

false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

38.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged. Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

39.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(i)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(ii)    Whether the Registration Statement and other Offering Documents issued and/or approved by Defendants omitted and/or misrepresented material facts about, among other things, New Century and its business and financial condition, performance, and prospects; and

(iii)    The extent of damages sustained by members of the Class and the appropriate measure of such damages.

## SUBSTANTIVE ALLEGATIONS

### The Materially False and Misleading Statements in the Offering Documents[2]

40.    On or about April 26, 2005, New Century filed a shelf registration for the sale of securities on Form S-3 with the SEC pursuant to Rule 415, triggering undertakings under Item 512(a) of Regulation S-K.

---

[2] The term "Offering Documents" as used herein refers to the following materials described or referred to herein: the April 26, 2005 Shelf Registration on Form S-3; the May 6, 2005 Prospectus; and the June 15, 2005 Prospectus Supplement; and all documents and information incorporated by reference in any of these aforementioned documents.

41.    On or about June 17, 2005, New Century filed the Form 424B5 Prospectus Supplement dated June 15, 2005 with the SEC in connection with the Offering. This Prospectus Supplement stated that the Company was offering 4.2 million shares of the Series A Preferred Stock, at a public offering price of $25.00 per share, for total proceeds of approximately $105 million. The June 15 Prospectus Supplement also listed six underwriters of the Offering, listed above at ¶¶ 29-34 as the Underwriter Defendants.

42.    The June 15, 2005 Prospectus Supplement attached the original May 6, 2005 Prospectus pursuant to which the Series A Preferred Stock was issued. Notably, the June 15, 2005 Prospectus Supplement stated that it "contain[ed] two parts. The first part is this prospectus supplement, which describes the specific terms of our Series A Preferred Stock that we are offering and also adds to and updates information included in the accompanying prospectus and the documents incorporated by reference into the accompanying prospectus. The second part is the accompanying prospectus, . . . You should read this entire prospectus supplement, as well as the accompanying prospectus, and the documents incorporated by reference that are described under 'Where You Can Find Additional Information About New Century' in each of this prospectus supplement and the accompanying prospectus."

43.    The May 6, 2005 Prospectus (which was attached to, and incorporated by reference in, the June 15, 2005 Prospectus Supplement) made the materially false and misleading claims, among other things, that:

> [New Century] originate[s] and purchase[s] loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV. [New Century] ha[s] been originating and purchasing sub-prime loans since 1996 and believe[s] [it has] developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially higher credit risks associated with this segment of the mortgage industry.

44.    The June 15, 2005 Prospectus itself also made the identical materially false and misleading claim as set forth in ¶ 44 above.

45.    The June 15, 2005 Prospectus Supplement also explicitly included selected consolidated financial data concerning New Century and taken from its previously reported audited financial results and statements filed with the SEC for each of the fiscal years for the past five year-period, dating back to 2000, including the Company's Annual Report for the fiscal year 2004. In this connection, the Prospectus stated that it included certain selected consolidated financial data:

> set forth below has been derived from our audited financial statements for each of the fiscal years in the five-year period ended December 31, 2004. The financial data for the three months ended March 31, 2005 and 2004 has been derived from our unaudited condensed consolidated financial statements. . . . The following selected financial data should be read in conjunction with the more detailed information contained in the financial statements and notes thereto for the fiscal year ended December 31, 2004 included in our Annual Report on Form 10-K, which is incorporated by reference into the accompanying prospectus. The following selected financial data should also be read in conjunction with the more detailed information contained in the financial statements and notes thereto and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" for the three months ended March 31, 2005 and 2004 included in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2005.

46.    The June 15, 2005 Prospectus Supplement also incorporated by reference previously reported information concerning the Company's prior financial results and internal financial and accounting controls, with the "authority" of designated accounting and auditing "EXPERT" KPMG LLP:

> The consolidated financial statements of New Century Financial Corporation and subsidiaries as of December 31, 2004 and 2003, and for each of the years in the three-year period ended December 31, 2004 and the management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2004, and the effectiveness of internal control over financial reporting as of December 31, 2004, have been incorporated by reference herein in reliance upon the reports of KPMG LLP, Independent Registered Public Accounting Firm, incorporated by reference herein and upon the authority of said firm as experts in accounting and auditing.

47.    The June 15, 2005 Prospectus further incorporated by reference a number of other important documents and information. In that respect, the June 15 Prospectus stated as follows:

We are "incorporating by reference" certain documents that we file with the Securities and Exchange Commission, which means that such documents are considered part of this prospectus supplement and that we can disclose important information to you by referring to those documents.

We incorporate herein by reference the documents listed below and any other information we file with the Securities and Exchange Commission under Sections 13(a), 13(c), 13 or 15(d) of the Exchange Act, including any filings after the date of this prospectus supplement until the offering is completed:

*    *    *

- our Annual Report on Form 10-K for the fiscal year ended December 31, 2004, filed on March 16, 2005, including those portions incorporated by reference therein of our Definitive Proxy Statement on Schedule 14A, filed on April 11, 2005, as amended on May 11, 2005;

- our Quarterly Report on Form 10-Q for the quarter ended March 31, 2005, filed on May 10, 2005, as amended on June 1, 2005;

- our Current Reports on Form 8-K, filed on January 5, 2005, January 7, 2005, January 13, 2005, February 3, 2005, February 14, 2005, February 18, 2005, March 3, 2005, March 11, 2005, March 15, 2005, April 5, 2005, May 5, 2005 and May 27, 2005;

*    *    *

In addition, we also incorporate by reference into this prospectus supplement additional information that we may subsequently file with the Securities and Exchange Commission under Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act prior to the termination of the offering. These documents include Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as proxy statements.

## The "Incorporated by Reference" Documents – New Century's 2004 and 2005 Financial Reports

### New Century's 2004 Annual Report

48.     Certain of New Century's previously filed financial reports, incorporated by reference in the Series A Preferred Offering documents (as set forth above), were materially false and misleading when the Registration Statement offering the Series A Preferred Stock became effective.

49.     For example, on March 16, 2005, the Company filed its Annual Report on Form 10-K for the fiscal year 2004. As referenced above, this 2004 Annual Report was specifically incorporated by reference into the Company's June 15, 2005 Prospectus Supplement, filed in

15

connection with the Series A Preferred Offering at issue here. The 2004 Annual Report made similar materially false and misleading claims, stating, among other things, that:

> We originate and purchase loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV. We have been originating and purchasing subprime loans since 1996 and believe we have developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially higher risks associated with this segment of the mortgage industry.

50.    New Century's 2004 Annual Report represented, *inter alia*, that the Company's financial results were prepared in compliance with GAAP, and that it had evaluated its internal controls and found them to be adequate and effective. Specifically, the Company stated in this regard:

> As of December 31, 2004, the end of our fourth quarter, our management, including our [CEO], Vice Chairman-Finance, [CFO], and President and [COO], has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended, or the Exchange Act. Based on that evaluation, our [CEO], Vice Chairman-Finance, [CFO], and President and [COO] concluded, as of December 31, 2004, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the [SEC] rules and forms.

## New Century's Filing for the First Quarter 2005

51.    Another document specifically incorporated by reference into the Offering Documents, and specifically into the June 15, 2005 Prospectus Supplement, was New Century's May 10, 2005 Quarterly Report on Form 10-Q for the fiscal first quarter of 2005, which was signed by Defendants Cole, Dodge, Gotschall and Morrice. This Quarterly Report (which was subsequently amended on June 1, 2005) repeated, among other things, that:

> We originate and purchase loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV. We have been originating and purchasing subprime loans since 1996 and believe we have developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing

> that allows us to effectively manage the potentially higher risks
> associated with this segment of the mortgage industry.

52.     However, as evidenced by both recent events and the detailed statements and observations of former Company employees with first-hand knowledge, set forth below, these representations in the Company's 2004 Annual Report and quarterly filing for the first quarter of 2005 were materially false and misleading.

53.     The Company's Offering Documents referenced above, including the documents incorporated by reference therein, were materially false and misleading, because at the time of the Offering, the Defendants concealed from and failed to disclose material adverse facts concerning, *inter alia*, the Company's financial and business condition and well-being. Specifically, Defendants failed to disclose at least the following material adverse facts and conditions that ultimately threatened the Company's survival and the value of Class members' investments

(a)     that the Company's reserves for loan losses were grossly insufficient;

(b)     that New Century failed to timely write down for residual interests in securitizations;

(c)     that the Company did not properly account for early-payment default and loan repurchase loss allowances;

(d)     that New Century was operating in an extremely risky and volatile industry without adequate internal and financial or business controls or monitors, and specifically lacked, among other things, any adequate policies, practices, procedures or safeguards for, *inter alia*, properly evaluating the creditworthiness of borrowers or evaluating or managing the increased risks associated with the segments of the mortgage industry in which New Century operated;

(e)     that the Company's financial statements were not prepared in accordance with GAAP; and

(f)     that, as a result of the these and other material omissions and misrepresentations, the Offering Documents were materially false and misleading.

54.     When the Offering was under way, unbeknownst to the Plaintiff and other Class members, the internal business and financial environment and structure at New Century was actually in a severe state of deterioration.

55.     Former New Century employees both before and during the Class period described an environment at the Company of persistent and extremely lax lending guidelines, which were not strengthened until late 2006 and early 2007.   According to these former employees, when these guidelines were finally and belatedly tightened, a "tremendous" decline in loans and loan applications resulted, because more and more potential borrowers no longer qualified under the newly tightened guidelines.

56.     Accordingly, the disclosures at the time of the Offering (in its May 6, 2005 Prospectus, as well as the June 15, 2005 Prospectus Supplement) that New Century "developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially higher credit risks associated with this segment of the mortgage industry," was materially false and misleading.   According to descriptions of former employees of New Century, these purportedly "comprehensive" and "sophisticated" processes were in truth based merely on  routine factors such as potential borrowers' credit scores, which were used industry-wide and were in any event routinely disregarded at New Century for the sake of approving otherwise unqualified loans.

57.     Similarly, New Century's claim at the time of the Offering to  "originate and purchase loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV" also materially misrepresented the true state of affairs at the Company.   Former Company employees reveal that for all practical purposes these were only preliminary criteria, and that sales and volume considerations, and meeting or exceeding quotas, routinely ruled the day at New Century, rather than these publicly disclosed loan evaluation criteria.

**New Century Routinely Violated its Own Lending Criteria in Order to Approve Otherwise Unqualified Loans**

58.    One former employee, who was with the Company for approximately three years ending in the first quarter of 2005 as Regional Operations Manager (referred to herein as "CW1") and later a Senior Underwriter, and worked at the Company's corporate headquarters in Irvine, California, described an environment at New Century as far back as 2004 in which exceptions to lending guidelines were routinely granted in order to approve otherwise unqualified loans in order to make loan quotas. CW1 described "cronyism and favoritism toward certain brokers" and indicated that New Century often approved loans that should not have been approved.

59.    CW1 also stated with respect to property appraisals, that the Company had an in-house staff of appraisers who reviewed the work of the appraisers hired by outside brokers. However, that internal department would not evaluate or question every appraisal, or apparently even most of them, but only those appraisals that they "thought would raise a red flag."

60.    CW1 stated the use of quotas was widespread at New Century. In fact, as a Regional Operations Manager, CW1 oversaw a staff of approximately 25 employees and stated that he routinely knew whether or not his department met its quota of new loans. In order to make its numbers, the Company would often project the number of loans they thought they could close by a certain time and these aspirations would then be reported as closed deals. This practice of falsely counting loans as "funded" before they actually qualified as such was equivalent to "pulling revenue forward," which created a skewed financial picture of the Company for any given month.

61.    Another former employee who was with the Company for approximately one and one-half years ending in the first quarter of 2006, working as a Funder, an Account Manager, and later an Underwriter (referred to hereinafter as "CW6"), confirmed New Century's employment of lax lending guidelines and business practices and undue focus on volume over loan quality. CW6 stated that at the end of the month, New Century would take anything to get their numbers. In essence they would throw loan applications against the wall and hope that some would stick.

CW6 reported that New Century's practice was to approve far more questionable loans approved at end of month in order to make its quotas.

62.     This focus on quotas and "meeting the numbers" at New Century was consistent with the true picture of New Century as having an obsession with sales, production and volume of loans, at the expense of loans quality, and showing an improper and extreme favoritism shown to high-volume mortgage and loan brokers. Also consistent with this was New Century's heavy emphasis on incentive commissions, and use of a staggered incentive structure which increased the percentage size of the commissions with each loan sold. While New Century loan officers were paid by commission and salary, the salary component was miniscule, and their compensation was mainly commission-based and paid on an ascending scale, meaning that the more loans an officer sold, the higher percentage commission of each loan's fees he or she received.

63.     According to a Loan Officer who worked for New Century in Morris Plains, New Jersey during the first half of 2005 (hereinafter referred to as "CW3") confirmed this commission-heavy, ascending-percentage compensation structure. CW3 stated that New Century Loan Officers salaries were minimal, in the range of $5.00 per hour, and they were dependent on commissions, and that they had to sell several loans a month to receive any commissions at all. CW3 recalled that the commission structure was tiered and based upon productivity, that commissions typically ranged between 50 and 40 percent, and that the more loans a loan officer initiated, the higher the commission rate.

64.     With respect to New Century's purported "sophisticated" and "comprehensive" process of "credit evaluation and risk-based pricing that allow[ed] [New Century] to effectively manage the potentially higher credit risks" in the segment of the mortgage industry in which it worked, former company employees revealed that the methods and processes used by the Company were in truth neither sophisticated nor comprehensive, but rather run-of-the-mill, credit-score based evaluations of potential borrowers that were used industry-wide, and in any

event routinely modified or overridden at New Century for the sake of selling more and larger loans to unqualified borrowers.

65.    For instance, according to CW1, everything was credit score and loan-to-value driven, and the size of the loan which a potential borrower received from New Century was routinely stretched beyond what he or she qualified for under his or her particular credit score. For example, if a credit score of 500 to 520 bought you a 70% loan, New Century would make an exception to that. According to CW1, New Century always stretched these tiers. One of the running jokes was -- if nobody else will take it, give it to New Century, they'll make the exception. CW1 recounted a number of occasions when New Century was accused of granting loans which it knew the borrower could not afford.

66.    CW1 also specifically dismissed the notion that New Century utilized "sophisticated" and "comprehensive" credit evaluation models, stating that New Century used a credit score because the industry itself has used these score based models. CW1 reported that the Company routinely bumped these scores up a tier or even two to qualify potential borrowers for larger loans, and said he often spent entire days working on nothing but exceptions to loan guidelines.

67.    Importantly, CW1 advised that this was a nationwide problem for New Century and not localized in California, where he was located.

68.    CW1 said that while the Company utilized "front-line initiation" software called FastQual, to which brokers had access, brokers simply fed information into the system to get pre-approval which again was merely based upon routine information such as a potential borrower's credit score. CW1 stated that FastQual was based on the broker's information and once the loan paperwork came in, the Company's guidelines, all he had to do was make a phone call get it done. CW1 said such "tweaking" was routinely approved by managers because of increased commissions and bonuses, and that it was also encouraged by the higher levels of management.

69.    CW1 also stated that management at times even directly instructed him to pump up numbers or relax standards. CW1 reported being overridden in such a manner on many loans

with which he was uncomfortable, stating that he would have a stack of approximately 50 loans that he was supposed to look at daily for exceptions and he would refuse to put his name on approximately 10 or 15 of those, and then they would go up to the next level (to the Assistant Vice President/Regional Sales Manager or to the Vice President) and often be approved despite CW1's objection.

70.    While the cracks may have begun to show internally well beforehand, New Century nevertheless continued to conceal and failed to take any steps to correct its fundamentally flawed business and financial condition until it the Company had already been pushed to the brink of collapse.  Another former Company employee, an Underwriter who worked for the Company from approximately mid-2005 until early this year (hereinafter referred to as "CW5"), stated that the Company's lending guidelines were not strengthened until near the "end" in late 2006/early 2007.  CW5 specifically stated that New Century began restricting these lending guidelines in approximately November 2006, and the guidelines became extremely strict by January 2007, when the program were tightened and loans fell off "tremendously" because loan applications were no longer meeting the Company's tightened lending guidelines.

## FIRST CLAIM

## VIOLATION OF SECTION 11 OF THE SECURITIES ACT

## [AGAINST ALL DEFENDANTS]

71.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein, except to the extent that any such allegation may be deemed to sound in fraud.

72.    This Claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiff and other members of the Class who purchased or otherwise acquired the Company's Series A Preferred stock pursuant to and/or traceable to the Offering of that Preferred Stock against New Century, the Individual Defendants, and the Underwriter Defendants, and were damaged thereby.

73.    As set forth above, the Registration Statement and other Offering Documents, when they became effective, contained untrue statements of material fact and omitted to state

material facts required to be stated therein or necessary to make the statements therein not misleading.

74.    The Company is the registrant for the Series A Preferred stock sold to Plaintiff and other members of the Class. The Company issued, caused to be issued and participated in the issuance of materially false and misleading written statements and/or omissions of material facts to the investing public that were contained in the Registration Statement and other Offering documents as set forth herein.

75.    The Individual Defendants, either personally or through an attorney-in-fact, signed the Registration Statement and/or were Directors or persons performing similar functions for the Company at the time of the Offering.

76.    The Underwriter Defendants are liable as underwriters in connection with the Offering.

77.    The Defendants named in this Claim are liable to Plaintiff and other members of the Class who purchased or otherwise acquired shares of the Company's Series A Preferred stock pursuant and/or traceable to the Offering.

78.    By virtue of the foregoing, Plaintiff and other members of the Class who purchased or otherwise acquired the Company's Series A Preferred stock pursuant to and/or traceable to the Offering are entitled to damages pursuant to Section 11.

79.    This Claim was brought within one year after discovery of the untrue statements and omissions in the Offering Documents, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the Company's Series A Preferred stock was first bona fide offered to the public.

80.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not materially misleading.

81.    At the times of purchase of New Century Series A Preferred stock, the Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

### SECOND CLAIM

### VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT
### [AGAINST THE INDIVIDUAL DEFENDANTS]

82.    Plaintiff repeats and realleges the allegations set forth above in the First Claim as if set forth fully herein, except to the extent that any such allegation may be deemed to sound in fraud.

83.    This Claim is brought against the Individual Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and other members of the Class who purchased or otherwise acquired the Company's Series A Preferred stock pursuant and/or traceable to the Offering.

84.    The Company is liable under Section 11 of the Securities Act as set forth in the First Claim herein with respect to the Offering.

85.    Each of the Individual Defendants was a control person of the Company with respect to the Offering by virtue of that individual's position as a senior executive officer and/or director of the Company.

86.    The Individual Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company as well as the contents of the Registration Statement and other Offering Documents at the time of the Offering. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other Offering Documents had the ability to either prevent their issuance or cause them to be corrected.

87.    As a result, the Individual Defendants are liable under Section 15 of the Securities Act for the Company's primary violation of Section 11 of the Securities Act.

88.    By virtue of the foregoing, Plaintiff and other members of the Class who purchased or otherwise acquired the Issuer's Series A Preferred stock pursuant and/or traceable to the Offering are entitled to damages against the Individual Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

(i)    declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

(ii)    awarding Plaintiff and other members of the Class damages together with interest thereon;

(iii)    awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

(iv)    awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

Plaintiff hereby demands a trial by jury on the issues so triable.

Dated:  April 10, 2007                    Respectfully submitted,

MILBERG WEISS & BERSHAD LLP

By: _____
Peter G. A. Safirstein (PS 6176)
Kent A. Bronson (KB 4906)
Roland Riggs (RR 1695)
One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

***Attorneys for Plaintiff and the Class***

## CERTIFICATE OF SERVICE

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, I am employed in the County of New York, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is One Pennsylvania Plaza, 49th Floor, New York, New York 10119.

2.     That on April 10, 2007, declarant served the CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITES LAWS by causing to deposit a true copy thereof in a United States mailbox at New York, New York in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of April, 2007, at New York, New York.

_____
SHEILA FEERICK

## NEW CENTURY FINANCIAL CORPORATION
### Service List
*Attorneys for Plaintiffs*

Laurence D. Paskowitz
**Paskowitz and Associates**
60 East 42nd Street, 46th Floor
New York, NY  10016
Telephone:  (212) 685-0969
Facsimile:  (212) 685-2306

Lionel Z. Glancy
Michael M. Goldberg
Peter A. Binkow
**Glancy Binkow and Goldberg**
1801 Avenue of the Stars, Suite 311
Los Angeles, CA  90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160

Nancy Kaboolian
**Abbey Gardy**
212 E. 39th Street
New York, NY  10016
Telephone:  (212) 889-3700
Facsimile:  (212) 684-5191

Roy L. Jacobs
**Roy Jacobs and Associates**
60 East 42nd Street, 46th Floor
New York, NY  10165
Telephone:  (212) 685-0969
Facsimile:  (212) 504-8386

Catherine J. Kowalewski
Darren J. Robbins
David C. Walton
**Lerach Coughlin Stoia**
 **Geller Rudman & Robbins**
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone:  (619) 231-1058
Facsimile:  (619) 231-7423

Arthur L. Shingler, III
Nicholas J. Licato
**Scott + Scott**
600 B. Street, Suite 1500
San Diego, CA  92101
Telephone:  (619) 233-4565
Facsimile:  (619) 233-0508

David R. Scott
**Scott + Scott**
108 Norwich Avenue
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432

Joseph W. Cotchett
Steven N. Williams
**Cotchett Pitre and McCarthy**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

Frederick W. Gerkens, III
John Halebian
**Lovell Steward Halebian**
500 Fifth Avenue, 58th Floor
New York, NY  10110
Telephone:  (212) 608-1900
Facsimile:  (212) 719-4677

Bruce G. Murphy
**Law Office of Bruce G. Murphy**
265 Llwyds Lane
Vero Beach, FL  32963
Telephone:  (516) 231-4202
Facsimile:  (772) 234-6608

Jeffrey P. Campisi
Joel B. Strauss
**Kaplan Fox and Kilsheimer**
805 Third Avenue, 22nd Floor
New York, NY  10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714

Laurence D. King
**Kaplan Fox and Kilsheimer**
555 Montgomery Street, Suite 1500
San Francisco, CA  94111
Telephone:  (415) 772-4700
Facsimile:  (415) 772-4707

Lori S. Brody
**Kaplan Fox and Kilsheimer**
1801 Century Park East, Suite 1460
Los Angeles, CA  90067
Telephone:  (310) 785-0800
Facsimile:  (310) 785-0897

Evan J. Smith
Steven S. Wang
**Brodsky & Smith, L.L.C.**
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA  90212
Telephone:  (310) 300-8425
Facsimile:  (310) 247-0160

Maya Saxena
Joseph E. White, III
**Saxena White**
2424 North Federal Highway, Suite 257
Boca Raton, FL  33431
Telephone:  (561) 394-3399
Facsimile:  (561) 394-3082

Larry A. Sackey
**Larry A. Sackey Law Offices**
11500 W. Olympic Boulevard, Suite 550
Los Angeles, CA  90064
Telephone:  (310) 575-4444
Facsimile:  (310) 575-4520

Henry H. Rossbacher
James S. Cahill
**Rossbacher Firm**
811 Wilshire Boulevard, Suite 1650
Los Angeles, CA  90017-2666
Telephone:  (213) 895-6500
Facsimile:  (213) 895-6161

Robert S. Green
**Green Welling**
595 Market Street, Suite 2750
San Francisco, CA  94105
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710

Thomas Glenn Martin
**Thomas Glenn Martin Law Offices**
One World Trade Center, Suite 800
Long Beach, CA  90831
Telephone:  (562) 208-9088
Facsimile:  (562) 684-0882

David A.P. Brower
**Brower Piven**
488 Madison Avenue
New York NY  10002
Telephone:  (212) 501-9000
Facsimile:  (212) 501-0300

Daniel Bernard Scotti
**Dreier LLP**
499 Park Avenue
New York, NY 10022
Telephone: (212) 328-6100
Facsimile: (212) 328-6101

John C. Kirkland
**Dreier Stein and Kahan**
North Tower
1620 26th Street, 6th Floor
Santa Monica, CA 90404
Telephone: (424) 202-6050
Facsimile: (424) 202-6250

Michael R. Reese
**Gutride Safier**
230 Park Avenue, Suite 963
New York, NY 10169
Telephone: (212) 579-4625
Facsimile: (212) 253-4272

Francis M. Gregorek
Marisa C. Livesay
Betsy C. Manifold
Rachele R. Rickert
**Wolf Haldenstein Adler Freeman & Herz**
Symphony Tower
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599

Klari Neuwelt
**Klari Neuwelt Law Offices**
110 East 59th Street, 29th Floor
New York, NY 10022
Telephone: (212) 593-8800
Facsimile: (212) 593-9131

Amir Stark
Lee Albert
**Mager and Goldstein LLP**
1650 Market Street, 21st Floor
Philadelphia, PA 19103
Telephone: (215) 640-3280
Facsimile: (215) 640-3281

Jayne A. Goldstein
**Mager and Goldstein**
1640 Town Center Circle, Suite 216
Weston, FL 33326
Telephone: (954) 515-0123
Facsimile: (954) 515-0124

Karen Hanson Riebel
Richard A. Lockridge
**Lockridge Grindal Nauen P.L.L.P.**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401-2159
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

Carolyn G. Anderson
**Zimmerman Reed**
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone: (612) 341-0400

Blake M. Harper
Jennifer A. Kagan
**Hulett Harper Stewart LLP**
550 West C. Street, Suite 1600
San Diego, CA 92101
Telephone: (619) 338-1133

James E. Miller
Patrick A. Klingman
**Shepherd Finkelman Miller and Shah, LLC**
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120

Nathan Zipperian
James C. Shah
**Shepherd Finkelman Miller and Shah, LLC**
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883

Michael D. Braun
**Braun Law Group**
12400 Wilshire Blvd., Suite 920
Los Angeles, CA 90025
Telephone: (310) 442-7755
Facsimile: (310) 442-7756

Alan Berg
**Alan Berg Law Offices**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) _____

Douglas M. Risen
Sherrie R. Savett
**Berger & Montague, P.C.**
1622 Locust Street
Philadelphia, PA 19103-6365
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604

Elaine T. Byszewski
**Hagens Berman Sobol Shapiro LLP**
700 South Flower Street, Suite 2940
Los Angeles, CA 90017-4101
Telephone:  (213) 330-7150
Facsimile:  (213) 330-7152

Reed R. Kathrein
**Hagens Berman Sobol Shapiro LLP**
425 Second Street, Suite 500
San Francisco, CA 94107
Telephone:  (415) 896-6300
Facsimile:  (415) 896-6301

Steve W. Berman
**Hagens Berman Sobol Shapiro LLP**
1301 5th Ave., Suite 2900
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

Koji F. Fukumura                          ***Attorneys for Defendants***
Philip C. Tencer
William E. Grauer
**Cooley Godward Kronish**
4401 Eastgate Mall
San Diego, CA  92121-1909
Telephone:  (858) 550-6000
Facsimile:  (858) 550-6420

## CERTIFICATION OF NAMED PLAINTIFF

I, Jay Peter Kaufman, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. I represent and warrant that I am authorized to execute this Certification on behalf of the purchasers of the subject securities described herein (including, as the case may be, myself, any co-owners, any corporations or other entities, and/or any beneficial owners).

5. I will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party or Lead Plaintiff.

7. I have listed below all my transactions in 9.125% Series A Cumulative Redeemable Preferred Stock (NYSE: NEW Pr A) DURING the Class Period specified in the complaint as follows:

| 9.125% Series A Cumulative Redeemable Preferred Stock | Purchase/Acquisition or Sale/Disposition | Quantity | Trade Date (mm/dd/yy) | Price per Share ($) |
|---|---|---|---|---|
| | | | | |
| SEE ATTACHED | | | | |
| | | | | |

These securities were acquired or held in (check all that apply):

☐ General (non-retirement account)     ☐ Merger/acquisition/distribution          ☐ Gift
☐ IRA                                  ☐ Employer-sponsored plan (401k, 403b, etc.)

8. During the three years prior to the date of this Certification, I have not sought to serve and I have not served as a representative party for a class in an action filed under the federal securities laws except as described below (if any):

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this ___5ᵗʰ___ day of ___April___ , 2007

_____
Jay Peter Kaufman

## Schedule A

### Jay Peter Kaufman TTEE Jay Peter Kaufman Revocable Trust
### New Century Financial Corp. Preferred Series A 9.12%

| | DATE | SHARES | COST |
|---|---|---|---|
| Purchase(s): | | | |
| | 08/07/06 | 2,000 | 24.6500 |
| | 08/07/06 | 5,000 | 24.6500 |
| | 08/07/06 | 8,000 | 24.6900 |
| | 08/07/06 | 15,000 | 24.6000 |

April 10, 2007


     This document is intended to certify that I, Jay Peter Kaufman, have signed the required Certifications in the matters of *The Jay Peter Kaufman Revocable Trust, et al v. New Century Financial Corp., et al.* in my capacity as trustee of the Jay Peter Kaufman Revocable Trust.


 

_____
Jay Peter Kaufman
Trustee, the Jay Peter Kaufman Revocable Trust