1  HULETT HARPER STEWART LLP
2  BLAKE MUIR HARPER, SBN: 115756
   JENNIFER A. KAGAN, SBN: 234554
3  550 West C Street, Suite 1600
   San Diego, CA 92101
4  Telephone:   (619) 338-1133
5  Facsimile:   (619) 338-1139
   e-mail: bmh@hulettharper.com
6        jenni@hulettharper.com
7
8  Attorneys for Plaintiff
   [Additional Counsel on Signature Page]
9
           IN THE UNITED STATES DISTRICT COURT
10
   CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION
11

12 WILLIAM KORNFELD, JR.,          Case No. SACV07-391 AG(ANx)
13 Individually and On Behalf of All
   Others Similarly Situated,       CLASS ACTION COMPLAINT
14                                   FOR VIOLATIONS OF FEDERAL
                                     SECURITIES LAWS
15              Plaintiff,

16 v.

17 ROBERT K. COLE, PATTI M.
18 DODGE, BRAD A. MORRICE,
   EDWARD F. GOTSCHALL,
19 HAROLD A. BLACK, FREDRIC J.
20 FORSTER, DONALD E. LANGE,
   WILLIAM J. POPEJOY, MICHAEL
21 M. SACHS, RICHARD A. ZONA,
22 MARILYN A. ALEXANDER, DAVID
   EINHORN and NEW CENTURY
23 FINANCIAL CORPORATION,
24                                   JURY TRIAL DEMANDED
25              Defendants.

26
27
28

## INTRODUCTION

This is a federal class action on behalf of purchasers of New Century Financial Corp. ("New Century" or the "Company") Series A Preferred shares and/or Series B Preferred shares, in connection with the Company's June 2005 and/or August 2006 Preferred Share Offerings (collectively, the "Offerings"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"). As alleged herein, in connection with the June 2005 Series A Preferred Share Offering and the August 2006 Series B Preferred Share Offering, Defendants issued joint Proxy-Prospectus and Registration Statements that each contained and incorporated materially false and misleading statements, and omitted to reveal material information necessary to make Defendants' statements, in light of such material omissions, not materially false and misleading.

## OVERVIEW

1.    Co-founded by Robert Cole, Brad Morrice and Edward Gotschall in 1995, New Century now purports to operate as a real estate investment trust in the United States, originating and purchasing mortgage loans. As of December 31, 2005, the Company had 35 regional operating centers located in 18 states and originated and purchased loans through its network of 47,000 mortgage brokers, as well as operated a central retail telemarketing unit, 2 regional processing centers, and 222 sales offices.

2.    As a result of the remarkable growth in the Company and its loan origination and servicing business, at all relevant times, New Century needed access to huge amounts of cash and debt (i.e. liquidity) to support its massive lending operations. In fact, as New Century continued to increase its loan volumes, it needed more and more cash to pay overhead and to reserve for loan losses. One way that Defendants were able raise these funds was through the sale of Preferred shares in public Offerings. In fact, in June 2005 and in August 2006, Defendants sold over $178 million in Series A and Series B Preferred shares, combined —

1

1    $120.75 million sold in June 2005 and $57.5 million sold in August 2006.

2        3.    To effectuate these sales, at the time of these Preferred Share
3    Offerings, Defendants repeatedly stated that New Century was achieving strong
4    results, that the Company was operating according to plan, and that New Century
5    maintained adequate accounting controls and procedures and, accordingly, the
6    Company was adequately reserved to meet its present and expected loan losses.
7    Statements to this effect were contained in the joint Proxy-Prospectus and
8    Registration Statements issued in connection with each of these Preferred Share
9    Offerings, and also contained in the Company's 2004 and 2005 Form(s) 10-K and
10    its 1Q:06 and 2Q:06 Form(s) 10-Q, incorporated by reference therein.

11        4.    Throughout the relevant period, Defendants also repeatedly stated that
12    New Century had *already* made all necessary adjustments to the Company's
13    financial statements and balance sheet, and that New Century's reserves were
14    periodically reviewed and adjusted, and had been determined to be sufficient.
15    However, the representations concerning the Company's systems and controls, and
16    Defendants' statements concerning New Century's financial condition, loan reserves
17    and GAAP compliance were patently untrue.

18        5.    Unbeknownst to investors, at the time of the June 2005 and August
19    2006 Preferred Share Offerings, New Century was suffering from a host of
20    undisclosed adverse factors which were negatively impacting its business and that
21    would foreseeably cause it to report declining financial results – materially less than
22    the market expectations Defendants had caused and cultivated.  In particular, at the
23    time of the Series A and Series B Preferred Share Offerings:

24        •    It was not true that the Company maintained necessary and
25            proper internal financial controls and operational procedures so as to
26            assure that New Century's financial results were true, accurate or
27            reliable, or reported in conformity with Generally Accepted Accounting
28            Principles.  In fact, at all relevant times, the Company's reported results

1    were *not* true and accurate, and they did *not* contain all necessary

2    adjustments and loan loss reserves or reflect the true financial or

3    operational condition of New Century.

4    •    As a result of the Company's lack of internal operational

5    procedures and financial controls, and as a result of Defendants' failure

6    to properly account for its allowances for loan losses and/or loan

7    repurchases, at the time of the Series A and Series B Preferred Share

8    Offerings, New Century's financial results were *not* true or accurate,

9    and they were *not* prepared in conformity with GAAP or SEC

10    accounting rules.

11    •    At the time of the Series A and Series B Preferred Share

12    Offerings, Defendants had presented a financial statement and balance

13    sheet that materially overstated the Company's profitability by under-

14    reporting reserves, by over-reporting New Century's asset values, and

15    by failing to make proper, timely adjustments to the Company's

16    operational and financial reports.

17    •    As a result of the aforementioned adverse conditions that

18    Defendants failed to disclose, at the time of the Series A and Series B

19    Preferred Share Offerings, Defendants lacked any reasonable basis to

20    claim that the Company was operating according to plan, or that New

21    Century could achieve guidance sponsored and/or endorsed by

22    Defendants.

23    6.    It was only beginning on February 7, 2007, that investors ultimately

24    learned the truth about New Century after Defendants revealed that *the Company's*

25    *previously filed financial statements for the first three quarters of 2006 could not be*

26    *relied upon,* and that New Century would be forced to restate that period, at a

27    minimum.    In addition to the foregoing, at that time Defendants *also lowered*

28    *forward guidance.*

3

1        7.    Following these belated disclosures, New Century Preferred shares
2    declined precipitously – with Series B Preferred shares falling from just below
3    $25.00 per share on February 7, 2007 to a close of just above $19.00 per share
4    within two trading days, on February 12, 2006.

5        8.    On March 5, 2007, New Century's Preferred shares continued to fall
6    after Standard & Poor's credit and debt rating agency cut its ratings on the Company
7    to CCC rating – eight levels below investment grade levels – following reports of a
8    *criminal investigation into the Company.*  According to reports, the U.S. Attorney's
9    Office for the Central District of California is now conducting a federal criminal
10   inquiry into trading in New Century securities as well as accounting errors.
11   According to S&P, *"the investigation and the damage it might do to the Company's*
12   *reputation create concern about New Century's ability to maintain its warehouse*
13   *lending lines, which are necessary to fund mortgage originations."*

14       9.    Following the announcement, on March 2, 2007, of the U.S Attorney's
15   investigation into the Company, when shares resumed trading on March 5, 2007,
16   New Century's Preferred shares again declined precipitously – with Series B
17   Preferred shares falling from $19.15 per share on March 2, 2007 to a close of $8.00
18   per share the following trading day.  Series A Preferred Shares also declined
19   materially at or about the same time.

20       10.    In addition to the foregoing, on March 7, 2007, Defendants also
21   revealed that New Century was operating well below analysts' expectations, that the
22   Company could not support guidance and that, "as a result of its current constrained
23   funding capacity" New Century had *ceased accepting loan applications from*
24   *prospective borrowers* – effectively putting an end to the Company's lending
25   activities indefinitely.

26   **JURISDICTION AND VENUE**

27       11.    Jurisdiction is conferred by § 22 of the Securities Act of 1933 (the
28   "Securities Act"), 15 U.S.C. § 77v.  The claims asserted herein arise under §§ 11,

1  12(a)(2) and 15 of the Securities Act, §§ 77k and 77o, and rules promulgated

2  thereunder by the Securities and Exchange Commission (the "SEC") [15 U.S.C.

3  §§ 78j(b)].

4       12.   Venue is proper in this District pursuant to § 22 of the Securities Act

5  [15 U.S.C. § 78aa].  Defendant New Century maintains its principal place of

6  business within this District, and/or the individual Defendants conduct business in,

7  and many of the acts giving rise to the violations complained of herein took place in

8  this District.

9       13.   In connection with the acts alleged in this Complaint, Defendants,

10  directly or indirectly, used the means and instrumentalities of interstate commerce

11  including, but not limited to, the mails, interstate telephone communications and the

12  facilities of the national securities markets.

13                             **PARTIES**

14       14.   Plaintiff William Kornfeld, Jr., as set forth in the accompanying

15  certification, incorporated by reference herein, purchased New Century Series A and

16  B Preferred stock in connection with and/or traceable to the Series A and B

17  Preferred Share Offerings, at artificially inflated prices during the Class Period and

18  has been damaged thereby.

19  **Corporate Defendant**

20       15.   Defendant New Century is a Maryland corporation with its principal

21  place of business and chief executive offices located at 18400 Von Karman, Irvine,

22  CA 92612.  Co-founded by Robert Cole, Brad Morrice and Edward Gotschall in

23  1995, New Century purports to operate as a real estate investment trust in the United

24  States, originating and purchasing mortgage loans.  The Company's Wholesale

25  division provides loans through a network of independent mortgage brokers and

26  correspondent lenders, and through its website.  The Company's Retail division

27  operates and originates loans through a consumer-direct channel and a

28  builder/realtor channel, including radio, direct mail, telemarketing, television

1   advertising, and the Internet.   As of December 31, 2005, the Company had 35

2   regional operating centers located in 18 states and originated and purchased loans

3   through its network of 47,000 mortgage brokers, as well as operated a central retail

4   telemarketing unit, 2 regional processing centers, and 222 sales offices.   New

5   Century Financial Corporation qualifies as a REIT under the Internal Revenue Code.

6   As a REIT, it is not subject to federal income tax to the extent it distributes 90% of

7   taxable income to its shareholders.

8   **Individual Defendants**

9       16.    Defendant Robert K. Cole ("Cole") was at the time of the June 2005

10   Series A Preferred Share Offering and/or the August 2006 Series B Preferred Share

11   Offering, Chairman of the Board of Directors and Chief Executive Officer, and was

12   a co-Founder of the Company.[1]   Defendant Cole prepared and/or assisted in the

13   preparation of the materially false and misleading Prospectus issued in connection

14   with the June 2005 Series A Preferred Share Offering and the August 2006 Series B

15   Preferred Stock Offering.   Defendant Cole also signed and certified the Company's

16   SEC filings, including but not limited to New Century's Form(s) 10-Q and Form(s)

17   10-K incorporated by reference into each joint Proxy/Prospectus issued in

18   connection with the Series A and Series B Preferred Share Offerings.

19       17.    Defendant Patti M. Dodge ("Dodge") was at the time of the June 2005

20   Series A Preferred Share Offering and August 2006 Series B Preferred Share

21   Offering, Chief Financial Officer, Principal Financial Officer and Executive Vice

22   President of the Company.[2]   Defendant Dodge prepared and/or assisted in the

23

24   [1]  Defendant Cole was replaced as CEO on 7/1/06, but remained as Chairman of the

25   Board of Directors of the Company until 1/1/07, and currently remains a member of

26   the Board.

27   [2]  Soon after the Series B Preferred Share Offering, on 11/11/06, defendant Dodge
     was removed from the position of CFO and relegated to lead New Century's

28   Investor Relations department.

1   preparation of the materially false and misleading Prospectus issued in connection

2   with the June 2005 Series A Preferred Share Offering and the August 2006 Series B

3   Preferred Stock Offering.   Defendant Dodge also signed and certified the

4   Company's SEC filings, including but not limited to New Century's Form(s) 10-Q

5   and Form(s) 10-K incorporated by reference into each joint Proxy/Prospectus issued

6   in connection with the Series A and Series B Preferred Share Offerings.

7         18.   Defendant Brad A. Morrice ("Morrice") was at the time of the June

8   2005 Series A Preferred Share Offering and August 2006 Series B Preferred Share

9   Offering, Vice Chairman, President and Chief Operating Officer as well as a founder

10  of the Company.[3]  Defendant Morrice prepared and/or assisted in the preparation of

11  the materially false and misleading Prospectus issued in connection with the June

12  2005 Series A Preferred Share Offering and the August 2006 Series B Preferred

13  Stock Offering. Defendant Morrice also prepared and/or assisted in the preparation

14  of the Company's SEC filings, including but not limited to New Century's Form(s)

15  10-Q and Form(s) 10-K incorporated by reference into each joint Proxy/Prospectus

16  issued in connection with the Series A and Series B Preferred Share Offerings.

17        19.   Defendant Edward F. Gotschall ("Gotschall") was at the time of the

18  June 2005 Series A Preferred Share Offering and August 2006 Series B Preferred

19  Share Offering, Vice Chairman (Finance) of the Board of Directors and a co-founder

20  of the Company. Defendant Gotschall prepared and/or assisted in the preparation of

21  the materially false and misleading Prospectus issued in connection with the June

22  2005 Series A Preferred Share Offering and the August 2006 Series B Preferred

23  Stock Offering.   Defendant Gotschall also prepared and/or assisted in the

24  preparation of the Company's SEC filings, including but not limited to New

25  Century's Form(s) 10-Q and Form(s) 10-K incorporated by reference into each joint

26

27  [3]  In addition, on 7/1/06 defendant Morrice was also appointed CEO of New

28  Century.

7

1  Proxy/Prospectus issued in connection with the Series A and Series B Preferred

2  Share Offerings.

3      20.    Defendant Harold A. Black ("Black") was at the time of the June 2005

4  Series A Preferred Share Offering and August 2006 Series B Preferred Share

5  Offering, a director of the Company. Defendant Black prepared and/or assisted in

6  the preparation of the materially false and misleading Prospectus issued in

7  connection with the June 2005 Series A Preferred Share Offering and the August

8  2006 Series B Preferred Stock Offering. Defendant Black also prepared and/or

9  assisted in the preparation of the Company's SEC filings, including but not limited

10  to New Century's Form(s) 10-Q and Form(s) 10-K incorporated by reference into

11  each joint Proxy/Prospectus issued in connection with the Series A and Series B

12  Preferred Share Offerings.

13      21.    Defendant Fredric J. Forster ("Forster") was at the time of the June

14  2005 Series A Preferred Share Offering and August 2006 Series B Preferred Share

15  Offering, a director of the Company – becoming Lead Director on or about 9/20/05.

16  Defendant Forster prepared and/or assisted in the preparation of the materially false

17  and misleading Prospectus issued in connection with the June 2005 Series A

18  Preferred Share Offering and the August 2006 Series B Preferred Stock Offering.

19  Defendant Forster also prepared and/or assisted in the preparation of the Company's

20  SEC filings, including but not limited to New Century's Form(s) 10-Q and Form(s)

21  10-K, incorporated by reference into each joint Proxy/Prospectus issued in

22  connection with the Series A and Series B Preferred Share Offerings. In addition to

23  the foregoing, at the time of the June 2005 Series A Preferred Share Offering,

24  Defendants Forster, Lange, Sachs and Zona were members of the Audit Committee.

25      22.    Defendant Donald E. Lange ("Lange") was at the time of the June

26  2005 Series A Preferred Share Offering and August 2006 Series B Preferred Share

27  Offering, a director of the Company. Defendant Lange prepared and/or assisted in

28  the preparation of the materially false and misleading Prospectus issued in

8

1   connection with the June 2005 Series A Preferred Share Offering and the August
2   2006 Series B Preferred Stock Offering.  Defendant Lange also prepared and/or
3   assisted in the preparation of the Company's SEC filings, including but not limited
4   to New Century's Form(s) 10-Q and Form(s) 10-K, incorporated by reference into
5   each joint Proxy/Prospectus issued in connection with the Series A and Series B
6   Preferred Share Offerings.  In addition to the foregoing, at the time of the June 2005
7   Series A Preferred Share Offering, Defendants Lange, Forster, Sachs and Zona were
8   members of the Audit Committee and Defendants Sachs served as Chairman of our
9   Audit Committee.

10      23.    Defendant William J. Popejoy ("Popejoy") was at the time of the June
11  2005 Series A Preferred Share Offering, an Officer of the Company, having served
12  as Chief Information Officer and Executive Vice President for New Century.[4]
13  Defendant Popejoy prepared and/or assisted in the preparation of the materially false
14  and misleading Prospectus issued in connection with the June 2005 Series A
15  Preferred Share Offering and the August 2006 Series B Preferred Stock Offering.
16  Defendant Popejoy also prepared and/or assisted in the preparation of the
17  Company's SEC filings, including but not limited to New Century's Form(s) 10-Q
18  and Form(s) 10-K, incorporated by reference into each joint Proxy/Prospectus issued
19  in connection with the Series A and Series B Preferred Share Offerings.

20      24.    Defendant Michael M. Sachs ("Sachs") was at the time of the June
21  2005 Series A Preferred Share Offering and August 2006 Series B Preferred Share
22  Offering, a director of the Company.  Defendant Sachs prepared and/or assisted in
23  the preparation of the materially false and misleading Prospectus issued in
24  connection with the June 2005 Series A Preferred Share Offering and the August
25  2006 Series B Preferred Stock Offering.  Defendant Sachs also prepared and/or
26
27  [4]  Defendant Popejoy retired on or about June 5, 2006 − immediately prior to the
28  August 2006 Series B Preferred Share Offering.

9

1  assisted in the preparation of the Company's SEC filings, including but not limited
2  to New Century's Form(s) 10-Q and Form(s) 10-K, incorporated by reference into
3  each joint Proxy/Prospectus issued in connection with the Series A and Series B
4  Preferred Share Offerings. In addition to the foregoing, at the time of the June 2005
5  Series A Preferred Share Offering, defendant Sachs served as Chairman of the
6  Company's Audit Committee and Defendants Lange, Forster and Sachs served as
7  members of this Committee.

8      25.    Defendant Richard A. Zona ("Zona") was at the time of the June 2005
9  Series A Preferred Share Offering and August 2006 Series B Preferred Share
10  Offering, an Officer of the Company, having served as Chief Information Officer
11  and Executive Vice President for New Century. Defendant Zona prepared and/or
12  assisted in the preparation of the materially false and misleading Prospectus issued
13  in connection with the June 2005 Series A Preferred Share Offering and the August
14  2006 Series B Preferred Stock Offering. Defendant Zona also prepared and/or
15  assisted in the preparation of the Company's SEC filings, including but not limited
16  to New Century's Form(s) 10-Q and Form(s) 10-K, incorporated by reference into
17  each joint Proxy/Prospectus issued in connection with the Series A and Series B
18  Preferred Share Offerings. In addition to the foregoing, at the time of the June 2005
19  Series A Preferred Share Offering, Defendants Zona, Lange, Forster and Sachs were
20  members of the Audit Committee.

21      26.    Defendant Marilyn A. Alexander ("Alexander") was at the time of the
22  June 2005 Series A and August 2006 Series B Preferred Share Offerings, a director
23  of the Company. Defendant Alexander prepared and/or assisted in the preparation
24  of the materially false and misleading Prospectus issued in Connection with the June
25  2005 Series A and August 2006 Series B Preferred Stock Offerings. Defendant
26  Alexander also prepared and/or assisted in the preparation of the Company's SEC
27  filings, including but not limited to New Century's Form(s) 10-Q and Form 10-K,
28  incorporated by reference into each joint Proxy/Prospectus issued in connection with

10

1 the June 2005 and August 2006 Series A and B Preferred Share Offerings.

2      27.   Defendant David Einhorn ("Einhorn") was at the time of the August

3 2006 Series B Preferred Share Offering, a director of the Company, having joined

4 the Board on or about March 31, 2006.[5] Defendant Einhorn prepared and/or assisted

5 in the preparation of the materially false and misleading Prospectus issued in

6 Connection with the August 2006 Series B Preferred Stock Offering. Defendant

7 Einhorn also prepared and/or assisted in the preparation of the Company's SEC

8 filings, including but not limited to New Century's Form(s) 10-Q and Form 10-K,

9 incorporated by reference into each joint Proxy/Prospectus issued in connection with

10 the August 2006 Series B Preferred Share Offering.

11      28.   The Defendants referenced above in ¶¶ 16-27 are referred to herein as

12 the "Individual Defendants."

13 **IPO Underwriter Defendants**

14      29.   In connection with the June 2005 Public Offering, the following

15 investment banks acted as "Lead Underwriters" of the Offering – distributing 4.2

16 million Preferred shares of New Century stock to investors and initiating the first

17 public market for New Century Series A Preferred shares. Not including another

18 630,000 Series A Preferred shares distributed upon exercise of the underwriters'

19 over-subscription allotment option, the distribution of the Series A Preferred shares

20 awarded Underwriters occurred, as follows:

| Underwriters | Number of Shares |
|---|---|
| Bear, Stearns & Co. Inc | 2,184,000 |
| Deutsche Bank Securities Inc. | 588,000 |
| Piper Jaffray & Co. | 588,000 |
| Stifel, Nicolaus & Company, Incorporated | 588,000 |

27 [5]  Defendant Einhorn resigned from the Company's Board of Directors, effective

28 immediately as of March 7, 2007.

11

| Underwriters | Number of Shares |
|---|---|
| JMP Securities LLC | 126,000 |
| Roth Capital Partners, LLC | 126,000 |
| Total Series A Preferred Shares Sold | 4,200,000 |

30.     In connection with the June 2005 Series A Preferred Share Offering, the Underwriter Defendants were paid approximately $3.8 million in fees – paid indirectly by purchasers of the Company's shares.  The Underwriter Defendants were paid at least $0.7875 per share in connection with the sale of the 4.83 million Series A Preferred shares, including shares sold pursuant to the exercise of the Underwriter's over-subscription option, as follows:

| | | Total | |
|---|---|---|---|
| | Per Share | Without OverAllotment | With OverAllotment |
| Underwriting discounts and commissions payable | $0.7875 | $    3,307,500 | $     3,803,625 |

31.     In addition to the foregoing, in connection with the August 2006 Series B Public Share Offering, the following investment banks also acted as "Lead Underwriters" – distributing 2.0 million Series B Preferred New Century shares to investors and initiating the first public market for New Century Series B Preferred stock.  Not including another 300,000 Series B Preferred shares distributed upon exercise of the underwriters' over-subscription allotment option, the distribution of the Series B Preferred shares awarded Underwriters occurred, as follows:

12

| Underwriters | Number of Shares |
|---|---|
| Bear, Stearns & Co. Inc. | 750,000 |
| Morgan Stanley & Co. Incorporated | 750,000 |
| Stifel, Nicolaus & Company, Incorporated | 380,000 |
| Jefferies & Company, Inc. | 120,000 |
| Total Series B Preferred Shares Sold | 2,000,000 |

32.    In connection with the August 2006 Series B Preferred Share Offering, the Underwriter Defendants were paid over $1.81 million in fees, indirectly paid by purchasers of the Company's shares. The Underwriter Defendants were paid at least $0.7875 per share in connection with the sale of the 2.3 million Series B Preferred shares, including shares sold pursuant to the exercise of the Underwriter's over-subscription option, as follows:

| | Per Share | Total Without Overallotment | Total With Overallotment |
|---|---|---|---|
| Underwriting discounts and commissions payable | $0.7875 | $1,575,000 | $1,811,250 |

33.    Shareholders were willing to, and did, pay over $5.6 million in combined fees to compensate the Underwriter Defendants for conducting purported significant due diligence investigations into New Century in connection with each of the Preferred Share Offerings.   The Underwriter Defendants due diligence investigation was a critical component of the initial public Preferred Share Offerings, and it was supposed to provide investors with important safeguards and protections.

34.    The due diligence investigations that were required by the Underwriter Defendants included a detailed investigation into New Century's accounting and loan loss reserve assumptions that extended well beyond a mere casual review of

13

1    New Century's accounting, financial report and operational and financial controls.

2    The failure of the Underwriter Defendants to conduct an adequate due diligence

3    investigation was a substantial contributing factor leading to the harm complained of

4    herein.

5        35.    In addition to the foregoing, because of the Underwriter Defendants'

6    and Individual Defendants' positions with the Company, they each had access to the

7    adverse undisclosed information about New Century's business, operations,

8    products, operational trends, financial statements, markets and present and future

9    business prospects via access to internal corporate documents (including the

10   Company's operating plans, budgets and forecasts and reports of actual operations

11   compared thereto), conversations and connections with other corporate officers and

12   employees, attendance at management and Board of Directors meetings and

13   committees thereof and via reports and other information provided to them in

14   connection therewith.

15       36.    In addition to the Underwriting Defendants, it is also appropriate to

16   treat the individuals named as Defendants herein as a group for pleading purposes

17   (the "Individual Defendants") and to presume that the false, misleading and

18   incomplete information conveyed in the Company's public filings, press releases

19   and other publications as alleged herein are the collective actions of the narrowly

20   defined group of Defendants identified above.  Each of the Individual Defendants,

21   by virtue of their high-level positions with the Company, directly participated in the

22   management of the Company, were directly involved in the day-to-day operations of

23   the Company at the highest levels and were privy to confidential proprietary

24   information concerning the Company and its business, operations, products, growth,

25   financial statements, and financial condition, as alleged herein.  Accordingly, the

26   Individual Defendants were also involved in drafting, producing, reviewing and/or

27   disseminating the false and misleading statements and information alleged herein,

28   and approved or ratified these statements, in violation of the federal securities laws.

14

37.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions made in connection with the issuance of Series A and Series B Preferred shares in June 2005 and August 2006, respectively, violated these specific requirements and obligations.

38.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Preferred Series A or Series B stock of New Century in connection with and/or traceable to the June 2005 and August 2006 public offerings, inclusive (the "Class") and who were damaged thereby. Excluded

15

1    from the Class are Defendants, the officers and directors of the Company, at all

2    relevant times, members of their immediate families and their legal representatives,

3    heirs, successors or assigns and any entity in which Defendants have or had a

4    controlling interest.

5         40.    The members of the Class are so numerous that joinder of all members

6    is impracticable. Following the June 2005 Offering, New Century preferred shares

7    were actively traded on the NYSE, and following the August 2006 Preferred Share

8    Offering, the Company had over 7.13 million shares of Series A and Series B

9    Preferred stock, collectively, issued and outstanding. While the exact number of

10   Class members is unknown to plaintiff at this time and can only be ascertained

11   through appropriate discovery, plaintiff believes that there are hundreds or

12   thousands of members in the proposed Class. Record owners and other members of

13   the Class may be identified from records maintained by New Century or its transfer

14   agent, and may be notified of the pendency of this action by mail, using the form of

15   notice similar to that customarily used in securities class actions.

16        41.    Plaintiff's claims are typical of the claims of the members of the Class

17   as all members of the Class are similarly affected by Defendants' wrongful conduct

18   in violation of federal law that is complained of herein.

19        42.    Plaintiff will fairly and adequately protect the interests of the members

20   of the Class and has retained counsel competent and experienced in class and

21   securities litigation.

22        43.    Common questions of law and fact exist as to all members of the Class

23   and predominate over any questions solely affecting individual members of the

24   Class. Among the questions of law and fact common to the Class are:

25             (a)    whether the federal securities laws were violated by Defendants'

26   acts as alleged herein;

27             (b)    whether statements made by Defendants to the investing public

28   during the Class Period misrepresented material facts about the business, operations

1   and management of New Century; and

2           (c)    to what extent the members of the Class have sustained damages

3   and the proper measure of damages.

4       44.    A class action is superior to all other available methods for the fair and

5   efficient adjudication of this controversy since joinder of all members is

6   impracticable. Furthermore, as the damages suffered by individual Class members

7   may be relatively small, the expense and burden of individual litigation makes it

8   impossible for members of the Class to individually redress the wrongs done to

9   them. There will be no difficulty in the management of this action as a Class action.

10              ## SUBSTANTIVE ALLEGATIONS

11  **Materially False and Misleading Statements Contained in the**
    **Preferred Share Offering Statements**

12

13          **June 2005 Series A Preferred Share Offering**

14      45.    On or about June 15, 2005, New Century initiated its Public Offering

15  of 4.2 million shares of Series A Preferred stock priced at $25.00 each. In addition,

16  Underwriters also received an option to purchase up to an additional 630,000 Series

17  A Preferred shares to cover any over-allotments. Thereafter, New Century Series A

18  Preferred shares were listed, and began trading on the NYSE.

19      46.    The New Century Series A Preferred Share Offering was made

20  through an underwriting syndicate led by Bear, Stearns & Co. Inc, who acted as sole

21  "book-running lead manager" for the Offering, and including Deutsche Bank

22  Securities Inc., Piper Jaffray & Co., Stifel, Nicolaus & Company, Inc., JMP

23  Securities LLC and Roth Capital Partners, LLC, who each acted as "co-managers."

24  In connection with the Series A Preferred Share Offering, these Underwriters

25  received gross proceeds of at least $3.8 million, not including hundreds of thousands

26  of dollars in added expenses. Gross proceeds from the sale of all Series A Preferred

27  shares, including the Underwriters over-subscription option, were at least $120.75

28  million.

17

1    47.    In connection with the Series A Preferred Share Offering, on or about

2  June 17, 2005, Defendants also filed with the SEC, pursuant to Form 424B5, a copy

3  of the final, amended joint Proxy-Prospectus.  In addition to describing the terms

4  and conditions of the Preferred Share Offering itself, the Series A Preferred Share

5  Offering Proxy-Prospectus contained statements that distinguished these shares from

6  shares of the Company's Common Stock.  In this regard, the Series A Preferred

7  Share Offering Prospectus stated, in part, the following:

8      **Liquidation Preference**

9      Upon our voluntary or involuntary liquidation, dissolution or winding

10     up, then, *before any distribution or payment shall be made to the*

11     *holders of any common stock or any other class or series of our stock*

12     *ranking junior to that class or series of our preferred stock in the*

13     *distribution of assets upon our liquidation, dissolution or winding up,*

14     *the holders of each class or series of our preferred stock shall be*

15     *entitled to receive out of our assets legally available for distribution to*

16     *stockholders liquidating distributions in the amount of the liquidation*

17     *preference per share* (set forth in the applicable prospectus

18     supplement), *plus an amount equal to all dividends accrued and unpaid*

19     *thereon* (which shall not include any accumulation in respect of unpaid

20     dividends for prior dividend periods if that class or series of our

21     preferred stock does not have a cumulative dividend). After payment of

22     the full amount of the liquidating distributions to which they are

23     entitled, the holders of that class or series of our preferred stock will

24     have no right or claim to any of our remaining assets. If, upon our

25     voluntary or involuntary liquidation, dissolution or winding up, our

26     legally available assets are insufficient to pay the amount of the

27     liquidating distributions on all outstanding shares of that class or series

28     of our preferred stock and the corresponding amounts payable on all

18

shares of other classes or series of our stock ranking on a parity with that class or series of our preferred stock in the distribution of assets upon our liquidation, dissolution or winding up, *then the holders of that class or series of our preferred stock and all other classes or series of our stock shall share ratably in that distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.*

If liquidating distributions shall have been made in full to all holders of shares of that class or series of our preferred stock, *our remaining assets shall be distributed among the holders of any other classes or series of our stock ranking junior to that class or series of our preferred stock upon our liquidation,* dissolution or winding up, according to their respective rights and preferences and in each case according to their respective number of shares. For those purposes, neither our consolidation nor merger with or into any other corporation, trust or other entity nor the sale, lease, transfer or conveyance of all or substantially all of our property or business shall be deemed to constitute our liquidation, dissolution or winding up.

**Voting Rights**

Except as set forth below or as otherwise indicated in the applicable prospectus supplement, *holders of our preferred stock will not have any voting rights.*

*Whenever dividends on any shares of that class or series of our preferred stock shall be in arrears for 18 months or six or more quarterly periods, the holders of those shares of that class or series of*

19

*our preferred stock* (voting separately as a class with all other classes or series of our preferred stock ranking on parity with such class or series of our preferred stock upon which like voting rights have been conferred and are exercisable) *will be entitled to vote for the election of two additional directors to our board of directors* (and our entire board of directors will be increased by two directors) at a special meeting called by one of our officers at the request of a holder of that class or series of our preferred stock or, if that special meeting is not called by that officer within 30 days, at a special meeting called by a holder of that class or series of our preferred stock designated by the holders of record of at least 10% of the shares of any of those classes or series of our preferred stock (unless that request is received less than 90 days before the date fixed for the next annual or special meeting of the stockholders), or at the next annual meeting of stockholders, and at each subsequent annual meeting until:

- if that class or series of our preferred stock has a cumulative dividend, then all dividends accumulated on those shares of our preferred stock for the past dividend periods and the then current dividend period shall have been fully paid or declared and a sum sufficient for the payment thereof set apart for payment, or

- if that class or series of our preferred stock does not have a cumulative dividend, then four consecutive quarterly periods of dividends shall have been fully paid or declared and a sum sufficient for the payment thereof set apart for payment.

Unless provided otherwise in any prospectus supplements for any

series of our preferred stock, so long as any shares of our preferred stock remain outstanding, *we shall not, without the affirmative vote or consent of the holders of at least two-thirds of the shares of each class* or series of our preferred stock outstanding at the time, given in person or by proxy, either in writing or at a meeting (that class or series voting separately as a class):

- *authorize or create, or increase the authorized or issued amount of, any class or series of our stock ranking senior to that class or series of our preferred stock* with respect to payment of dividends or the distribution of assets upon our liquidation, dissolution *or winding up or reclassify any of our authorized stock into those shares, or create, authorize or issue any obligation or security convertible into or evidencing the right to purchase those shares; or*

- *amend, alter or repeal the provisions of the charter in respect of that class or series of our preferred stock,* whether by merger, consolidation or otherwise, so as to materially and adversely affect any right, preference, privilege or voting power of that class or series of our preferred stock...

48.    The Series A Preferred Share Offering Prospectus also contained statements regarding New Century's controls and procedures, its purported loan loss reserve and accounting and its estimating practices. In this regard the Series A Preferred Share Offering Prospectus also stated, in part, the following:

We have controls and processes designed to help us identify misrepresented information in our loan origination operations.

* * *

21

1    We are required to establish reserves based on our anticipated
2    delinquencies and losses. We also re-acquire the risks of delinquency
3    and default for loans that we are obligated to repurchase. We attempt
4    to manage these risks with risk-based loan pricing and appropriate
5    underwriting policies and loan collection methods.

6                                    * * *

7    We also re-acquire the risks of delinquency and default for loans that
8    we are obligated to repurchase. We attempt to manage these risks with
9    risk-based loan pricing and appropriate underwriting policies and loan
10   collection methods.

11        49.   The June 2005 Series A Preferred Share Proxy-Prospectus also
12   incorporated by reference several of the Company's then recent SEC filings,
13   including but not limited to New Century's 2004 Annual Report, filed pursuant to
14   Form 10-K. In addition to reiterating many of the same or similar statements
15   concerning the Company and its operations as had been made in the joint Offering
16   Proxy-Prospectus, the 2005 Form 10-K also represented to investors that the
17   Company's financial statements and disclosures were made in accordance with
18   Generally Accepted Accounting Principles and that the Company's consolidated
19   financial statements contained all necessary adjustments. In this regard, the Proxy-
20   Prospectus stated, in part, the following:

21        **Critical Accounting Policies**

22        *We have established various accounting policies that govern the*
23        *application of accounting principles generally accepted in the United*
24        *States in the preparation of our financial statements.* Certain
25        accounting policies require us to make significant estimates and
26        assumptions that may have a material impact on certain assets and
27        liabilities or our results of operations, and we consider these to be
28        critical accounting policies. *The estimates and assumptions we use are*

                                    22

*based on historical experience and other factors which we believe to be*
*reasonable under the circumstances.* Actual results could differ
materially from these estimates and assumptions, which could have a
material impact on the carrying value of assets and liabilities and our
results of operations. We believe the following are critical accounting
policies that require the most significant estimates and assumptions that
are subject to significant change in the preparation of our consolidated
financial statements. *These estimates and assumptions include, but are*
*not limited to, the interest rate environment, the economic environment,*
*secondary market conditions*, and the performance of the loans
underlying our residual assets and mortgage loans held for investment.

50.    In addition to the general statements concerning the propriety of the
Company's purported internal adjustments and GAAP compliance, the June 2005
Series A Preferred Share Offering Proxy-Prospectus also contained specific
representations regarding New Century's significant accounting policies – including
its accounting for loan loss and loss reserves – as follows:

**Allowance for Losses on Mortgage Loans Held for Investment**

*For our mortgage loans held for investment, we establish an allowance*
*for loan losses based on our estimate of losses inherent and probable*
*as of the balance sheet date. We charge off uncollectible loans at the*
*time of liquidation. We evaluate the adequacy of this allowance each*
*quarter, giving consideration to factors such as the current*
*performance of the loans, credit characteristics of the portfolio, the*
*value of the underlying collateral and the general economic*
*environment.* In order to estimate an appropriate allowance for losses
on loans held for investment, we estimate losses using "static pooling,"
which stratifies the loans held for investment into separately identified
vintage pools. Using historic experience and taking into consideration

23

1   the factors above, we estimate an allowance for credit losses, which we
2   believe is adequate for known and inherent losses in the portfolio of
3   mortgage loans held for investment. We charge the loss provision to
4   our consolidated statement of operations. *We charge losses incurred*
5   *on mortgage loans held for investment to the allowance.*
6
7   The allowance for losses on mortgage loans held for investment, as a
8   percentage of mortgage loans held for investment as of December 31,
9   2004, was approximately 0.73% of the unpaid principal balance of the
10  loans.
11                                    * * *
12  *Provision for losses on mortgage loans held for investment*
13  We establish an allowance for loan losses based on our estimate of
14  losses inherent and probable as of our balance sheet date. Provision for
15  losses on mortgage loans held for investment increased to $70.3 million
16  for the year ended December 31, 2004 from $26.3 million for the same
17  period in 2003, due to the increase in the portfolio of mortgage loans
18  held for investment and related allowance for loan losses. Mortgage
19  loans held for investment grew from $4.7 billion at December 31, 2003
20  to $13.2 billion at December 31, 2004.
21      51.   In addition to the foregoing, the Proxy-Prospectus also purported to
22  provide more color on New Century's business and operations and stated, in part,
23  the following:
24  Business Strategy
25  Our business objective is to provide a stable and growing dividend to
26  our stockholders by growing and managing a portfolio of mortgage
27  related assets. We intend to execute this strategy by:
28

24

- **Building our portfolio of mortgage-related assets.** We intend to increase our portfolio by retaining self-originated loans through securitizations structured as financings. We believe this portfolio will continue to increase our interest income and, accordingly, our dividend. We expect that our capacity to originate loans will provide us with a significant volume of loans at a lower cost and with greater reliability than if we purchased our portfolio from a third party.

- **Actively managing our mortgage loan portfolio.** We will seek to actively manage the interest rate and credit risks relating to holding a portfolio of mortgage-related assets in an effort to generate an attractive risk-adjusted return on our stockholders' equity. We will continue to use hedge instruments to attempt to reduce the interest rate exposure that results from financing fixed-rate assets with floating-rate liabilities. We will also actively monitor our portfolio to manage our credit exposure through early detection and management of probable delinquencies.

- **Maintaining a strong capital and liquidity base.** *We will seek to strengthen our balance sheet by managing prudent levels of capital and liquidity and by increasing our liquidity and capital position through future offerings of debt and equity.* We will also seek to increase available capacity under our credit facilities and to enhance our cash position by retaining some or all of our earnings in our taxable REIT subsidiaries. *We believe a strong balance sheet will allow us to more prudently manage our loan portfolio during temporary market disruptions.*

**Underwriting Standards**

The loans we originate or purchase generally do not satisfy conventional underwriting standards of conforming lenders. Therefore, our loans are likely to have higher delinquency and foreclosure rates than portfolios of mortgage loans underwritten to conventional standards.

*Our underwriting guidelines take into account the applicant's credit history and capacity to repay the proposed loan as well as the secured property's value and adequacy as collateral for the loan.* Each applicant completes an application that includes personal information on the applicant's liabilities, income, credit history and employment history. *Based on our review of the loan application and other data from the applicant against our underwriting guidelines, we determine the loan terms, including the interest rate and maximum LTV.* [Emphasis added.]

52.    As further evidence of the purported controls and procedures in place at the time of the 2004 Form 10-K, incorporated by reference into the June 2005 Series A Preferred Share Offering, the Proxy-Prospectus also stated, in part, the following:

**Collateral Review**

A qualified independent appraiser inspects and appraises each mortgage property and gives an opinion of value and condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals must conform to the Uniform Standards of Professional Appraisal Practice adopted by the

26

1  Appraisal Foundation's Appraisal Standards Board and are generally on
2  forms acceptable to Fannie Mae and Freddie Mac. *Our underwriting*
3  *guidelines require a review of the appraisal by one of our qualified*
4  *employees or by a qualified review appraiser that we have retained.*
5  *Our underwriting guidelines then require our underwriters to be*
6  *satisfied that the value of the property being financed, as indicated by*
7  *the appraisal, would support the requested loan amount.*

8                                    * * *

9  **Item 9A.  Controls and Procedures**
10  (a)    Evaluation of Disclosure Controls and Procedures
11  *As of December 31, 2004, the end of our fourth quarter, our*
12  *management, including our Chief Executive Officer, Vice Chairman-*
13  *Finance, Chief Financial Officer, and President and Chief Operating*
14  *Officer, has evaluated the effectiveness of our disclosure controls and*
15  *procedures*, as such term is defined in Rule 13a-15(e) promulgated
16  under the Securities Exchange Act of 1934, as amended, or the
17  Exchange Act. Based on that evaluation, our Chief Executive Officer,
18  Vice Chairman-Finance, Chief Financial Officer, and President and
19  Chief Operating Officer concluded, *as of December 31, 2004, that our*
20  *disclosure controls and procedures were effective to ensure that*
21  *information required to be disclosed by us in reports that we file or*
22  *submit under the Exchange Act is recorded, processed, summarized*
23  *and reported within the time periods specified in the Securities and*
24  *Exchange Commission rules and forms.*
25
26  (b)    Management's Report on Internal Control over Financial
27  Reporting.
28  Our management is responsible for establishing and maintaining

27

1    effective internal control over financial reporting as defined in Rules

2    13a-15(f) under the Securities Exchange Act of 1934. Our internal

3    control over financial reporting is designed to provide reasonable

4    assurance to our management and board of directors regarding the

5    preparation and fair presentation of published financial statements, in

6    accordance with generally accepted accounting principles.

7                                    * * *

8    *Our management assessed the effectiveness of our internal control over*

9    *financial reporting as of December 31, 2004.* In making this

10   assessment, our management used the criteria set forth by the

11   Committee of Sponsoring Organizations of the Treadway Commission

12   (COSO) in Internal Control – Integrated Framework. Based on our

13   assessment, management has concluded that, as of December 31, 2004,

14   *our internal control over financial reporting is effective based on those*

15   *criteria.*

16

17   Our management's assessment of the effectiveness of internal control

18   over financial reporting as of December 31, 2004, has been audited by

19   KPMG LLP, the independent registered public accounting firm who

20   also audited our consolidated financial statements. KPMG's report on

21   management's assessment of our internal control over financial

22   reporting appears on page F-3 hereof.

23

24   (c)    Changes in Internal Control Over Financial Reporting.

25   During 2004, we initiated the implementation of a new integrated Loan

26   Origination System (the "new LOS") for our wholesale production

27   units and related support units. As of December 31, 2004, all of our

28   wholesale production and related support units were using the new

                                    28

1  ·LOS. The implementation of this new LOS required changes to our
2  system of internal control over financial reporting. We reviewed each
3  system as it was being implemented and the internal control affected by
4  the implementation. *We made appropriate changes to the affected*
5  *internal controls as we implemented the new systems. We believe that*
6  *the controls as modified are appropriate and functioning effectively.*
7
8  During the fourth quarter of 2004, we changed our capital structure in
9  order to enable us to qualify as a REIT for U.S. federal income tax
10  purposes. The conversion to a REIT has involved changes in internal
11  controls; accordingly, these changes required changes to our system of
12  internal control over financial reporting. *We made appropriate changes*
13  *to the affected internal controls and believe that the controls as*
14  *modified are appropriate and functioning effectively.*
15
16  Other than the matters set forth in the two immediately preceding
17  paragraphs, *there was no change in our internal control over financial*
18  *reporting during our quarter ended December 31, 2004* that materially
19  affected, or is reasonably likely to materially affect, our internal control
20  over financial reporting.
21      53.    The 2004 Form 10-K incorporated by reference into the Company's
22  June 2005 Series A Preferred Share Offering Prospectus also contained
23  Certifications by Defendants Cole, Gotschall, Morrice and Dodge that attested to the
24  purported accuracy and completeness of the Company's financial and operational
25  reports, as follows:
26      1.    *I have reviewed this annual report on Form 10-K of New*
27  *Century Financial Corporation;*
28      2.    *Based on my knowledge, this report does not contain any untrue*

29